## WELLS FARGO BANK & UNION TRUST CO. v. McDUFFIE.*

### No. 7344.

Circuit Court of Appeals, Ninth Circuit.
June 12, 1934.

Lawrence C. Baker, Lloyd W. Dinkelspiel, and Heller, Ehrman, White & McAuliffe, all of San Francisco, Cal., for appellant.

Gregory, Hunt & Melvin, Wm. H. Hunt, Ward Sullivan, Sullivan, Roche, Johnson & Barry, and Theo. J. Roche, all of San Francisco, Cal., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

This action was brought in equity by the appellee receiver, hereinafter called "the receiver," of the Richfield Oil Company of California, hereinafter to be called "Richfield Oil Company," to prevent the appellant bank, hereinafter called the "bank," from applying the proceeds of four foreign bills of exchange (three 180-day bills of exchange drawn on Birla Bros. of Calcutta, India, and one drawn on Ricardo Velazquez of Cali, Colombia) upon an indebtedness due from the Richfield Oil Company to the bank. To distinguish between the drafts drawn by the Richfield Oil Company on the Wells Fargo Bank, payable to themselves, which were to be accepted by the bank, and the foreign

*Rehearing denied Aug. 29, 1934.

drafts drawn on the customers of the Richfield Oil Company, we will refer to the latter as foreign bills of exchange.

Before this case was tried in the lower court, the bills of exchange had been paid to the bank, and the court, in lieu of the relief originally prayed for, gave judgment for the amount of $163,305.85. At the time the receiver was appointed for the Richfield Oil Company on January 15, 1931, the latter owed $625,000 to the appellant.

The ultimate question involved in this case is whether or not the appellant bank is entitled to apply the proceeds of the foreign bills of exchange upon the general indebtedness above mentioned. The legal questions involved in the exercise of that right of set-off are based upon transactions beginning October 6, 1930, between the Richfield Oil Company and the appellant bank, whereby a new line of credit, based upon its foreign commerce, was extended to the Richfield Oil Company to the aggregate amount of $155,000. There is the further question of a subsequent waiver of the right of set-off. Much of the confusion in the case has arisen from the introduction of evidence of the negotiations between the parties beginning in August, 1930, leading up to the acceptance agreement of October 8, 1930, and of the numerous transactions which occurred thereafter. The contract between the parties was, in the main, in writing. Each party relies more strongly on parol testimony than is justified under the law concerning the effect of written contracts. The bank takes the broad view that the evidence, oral and documentary, shows that the agreement between the parties was one for a revolving credit, first for $150,000, and, subsequently, for $155,000, and that all bills of exchange deposited with them in connection with the foreign business of the Richfield Oil Company were deposited under this agreement. The appellee correctly contends that the written agreements must be construed according to their terms and that these terms are conclusive as to the agreement between the parties, but that the references therein to drafts and other documents may be explained by parol evidence.

Appellee's further contention that there was an oral agreement which excluded the foreign bills of exchange involved in this action from the effect of the written agreements cannot be sustained. Before stating the contracts and evidence in relation thereto, it should be observed that the rules with reference to the use of parol evidence in construing a written agreement between the parties are succinctly stated in the Codes of California, and in the decisions of its courts, as follows:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Section 1625, Civ. Code Cal.

"A contract in writing takes effect upon its delivery to the party in whose favor it is made, or to his agent." Section 1626, Civ. Code Cal.

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this title." Section 1639, Civ. Code Cal.

"Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Section 1642, Civ. Code Cal.

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings;

"2. Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in section eighteen hundred and sixty, or to explain an extrinsic ambiguity, or to establish illegality or fraud. The term agreement includes deeds and wills, as well as contracts between parties." Code Civ. Proc. Cal., § 1856.

Parol evidence can be introduced to identify the subject-matter of the contract, but not to contradict its terms. Gardiner v. McDonogh, 147 Cal. 313, 81 P. 964. There may be a valid, oral collateral agreement, if it does not conflict with or alter the terms of the written agreement. Whittier v. Home Savings Bank, 161 Cal. 311, 317, 119 P. 92; Dollar v. International Banking Co., 13 Cal. App. 331, 109 P. 499. But where the written agreement purports to be complete, terms cannot be added to it by parol. Empire Inv. Co. v. Mort, 169 Cal. 732, 147 P. 960.

On October 6, 1930, in pursuance of ne-

gotiations theretofore had between Robert Hall, representing the Richfield Oil Company, and various officers of the appellant bank concerning the extension of credit based upon the business of the foreign department of the Richfield Oil Company, Hall presented to the bank an "acceptance agreement" dated October 4, 1930, addressed to the appellant bank, in part as follows:

"Acceptance Agreement. (Arising out of importation or exportation of goods). To Wells Fargo Bank & Union Trust Co., San Francisco. Dear Sirs:

"We hand you herewith, for acceptance, the following drafts:

Number Date Covering following Amount Merchandise

Oct. 6            $150,000

"Payable in San Francisco to the order of Ourselves.

"It is agreed that the proceeds of the above will be used for financing the actual goods under consideration, and the proceeds of the sale of the goods shall be applied to liquidate the acceptance. * * * We waive all liability on your part in case the goods are not according to contract, either in description, quality or quantity, or in any other respect. All bills of lading * * * and all money and goods held by you as security for any such acceptance shall also be held by you as security for any other liability from us to you whether then existing or thereafter contracted and bind ourselves to furnish you prior to ———— with shipping documents covering this merchandise or with exchange arising out of the transaction being financed by the credit. * * * All goods represented by bills of lading * * * pledged with you as security for your acceptances hereunder shall be at all times covered by us by certificates of insurance * * * to an amount sufficient to cover your advances or obligations hereunder, and you are to have specific claim and lien on such policies and their proceeds to the amount of your interest in the goods thereby insured. * * * We hereby give to you full power and authority to sell, assign, transfer and deliver the whole or any part of the securities, bills of lading * * * or the goods represented thereby, and * * * agree that you may become a purchaser at such sale and hold the property or security so purchased as your own property. * * *

"In case of any sale or other disposition of the whole or any part of the security or property aforesaid, you may apply the proceeds of such sale or disposition to the payment of all legal or other costs and expenses of collection, sale and delivery and of all expenses incurred in protecting the security or other property or the value thereof, as hereinafter provided and may apply the residue of such proceeds to the payment of this or of any then existing liability of ours to you whether then payable or not, returning the overplus to us and in case of any deficiency we agree to pay to you the amount thereof forthwith with legal interest. You may also, upon any such non-payment [of Richfield Oil Company's drafts accepted by the bank] apply the balances of all our deposit accounts in the same way that you are authorized to apply the proceeds of any sale of the security or property hereunder. * * * We hereby agree to indemnify you against any liability or responsibility for the correctness, validity, or genuineness of any documents or any signatures or endorsements thereon representing goods which you hold, purchase or sell under this engagement, * * * and against any general loss or charges or other expenses incurred accruing with respect to such goods. * * * [signed] Richfield Oil Company of California."

We will refer to this document in accordance with its title as the "acceptance agreement," although the entire agreement between the parties based upon the credit extended by such acceptances is in fact the acceptance agreement between them. This acceptance agreement was accompanied by fourteen drafts dated October 6, 1930, aggregating $150,000 drawn by Richfield Oil Company upon the Wells Fargo Bank in favor of "Ourselves," for which a written receipt was given by the bank. This, it will be observed, was a written proposal to make a contract. On October 8, 1930, he delivered to the bank two letters of transmission dated October 7, 1930, and the documents therein described. The first letter is as follows:

"October 7, 1930.

"Wells Fargo Bank and Union Trust Company, Market at Montgomery, San Francisco, California.

"Subject: Drafts #103004 and #103005.

"Birla Brothers, Ltd., M/S 'Silver Hazel'.

"Gentlemen: We are enclosing the following enumerated documents covering shipment going forward to Calcutta, India per the M/S 'Silver Hazel':

"1—Our Draft #103004 amounting to $63,950.00 drawn at sight on Birla Brothers, Ltd.

"2—Our Draft #103005 amounting to $63,950.00 drawn at 180 days sight on Birla Brothers, Ltd.

"3—Our Invoice #930112 in the amount of $127,900.00.

"4—Insurance Policy in triplicate.

"5—Three originals Bill of Lading.

"Provided these documents are found to be in order, please forward them to your correspondent bank at Calcutta, requesting them to notify you immediately by wire of non-acceptance or non-payment of draft at maturity. Thanking you, we remain, Yours very truly, Richfield Oil Company of California, B. D. Blanchard, Assistant Manager, Foreign Department."

The second letter of transmission covered a similar shipment to Birla Bros. on the "Silver Ray" with two bills of exchange for $55,900.76 each, one payable at sight and the other 180 days after sight. Another letter dated October 8, 1930, by the comptroller of the Richfield Oil Company to the assistant vice president of the appellate bank, states:

"We are sending by Mr. Hall, documents covering a shipment to Birla Brothers, Ltd., Calcutta, India.

"Will you please release against this shipment $115,000 worth of acceptances made payable at 90 days sight."

■ The most important question in the case is whether or not these two 180-day foreign bills of exchange, aggregating $119,850.75, on Birla Bros., Calcutta, handed to the bank on October 8, 1930, were covered by the terms of the acceptance agreement.

It is agreed that the acceptance agreement, although in writing, does not of itself sufficiently identify the documents or security which was the subject-matter of the contract between the parties without the consideration of parol testimony. The drafts referred to in the acceptance agreement as handed to the bank for acceptance are described therein merely by their date, October 6th, and the fact that they are payable in San Francisco to the order of "Ourselves," which implies that the drafts are drawn by the Richfield Oil Company, payable to themselves. They are also indicated by the amount of $150,000. They were, however, described in the receipt signed by the bank. The parol evidence shows that the total number of drafts presented on October 6, 1930, by the Richfield Oil Company for acceptance

by the bank, all dated October 6, 1930, payable to themselves, aggregated $150,000, but on October 8th the amount of drafts to be accepted was limited to $115,000 by the terms of the letter of October 7, 1930, which constituted an amended offer. The transaction thus consummated on October 8, 1930, by this delivery of the letters dated October 7th, and of the documents therein described, and by the acceptance of nine of the drafts for which a receipt had been issued on October 6th, definitely identifying the drafts aggregating $150,000 which were handed to the bank for acceptance, and the nine drafts aggregating $115,000 which were accepted by the bank. The security given to the bank for such acceptance is not indicated by the written acceptance agreement alone other than by the words "merchandise," and "goods." But the delivery of the bills of lading clearly identifies such goods.

It is clear also from the acceptance agreement that the goods in question were to be exported and that the ownership thereof was to be indicated by bills of lading. This acceptance agreement was upon a form used by the bank and most of the provisions therein were no doubt printed. As indicated in the letters of transmission from the Richfield Oil Company to the bank dated October 7, 1930, the goods referred to were in transit to Calcutta, India, upon the "Silver Hazel" and the "Silver Ray," and consisted of kerosene and fuel oil which was specifically described in the bill of lading. A consideration of the writings exchanged without the aid of any oral evidence other than the fact of delivery of such documents shows that the security of the bank for its liability under its acceptance of the drafts presented to it was to be merchandise in transit on board the "Silver Hazel" and "Silver Ray" which was described in the acceptance agreement as "merchandise" and also as "goods," and that in order to effect the pledge of this cargo the Richfield Oil Company transferred its bills of lading therefor, properly assigned, to the bank, together with foreign bills of exchange drawn upon the purchaser of the goods represented by the bills of lading which would enable the bank to realize upon the value thereof by receiving from the purchaser the price thereof.

It is clear that during the voyage, by reason of the possession of the bills of lading, and under the terms of the acceptance agreement, the bank was secured by the entire value of the cargo. The transaction between the parties was evidenced with clarity and

definiteness by the written acceptance agreement, by the written documents accompanying the agreement, by the written acceptance endorsed by the bank, and by the letters exchanged and by the credit realized to the Richfield Oil Company upon nine drafts presented to the bank for acceptance and needed no additional parol evidence to identify the subject-matter of the contract and establish its terms.

The appellee contends " * * * that the agreement related to drafts and nothing else. * * * Only short-term drafts were being deposited as security under the acceptance, the balance being sent to the bank for collection alone. * * * As these securities were not described or specified in the agreement, recourse was had to parol evidence from which it was clearly shown that certain drafts only were deposited under the agreement as security for the acceptances to be issued. * * * Recourse to the evidence, however, shows that only the so-called short term drafts were understood and deemed to be under the acceptances, and that the proceeds of the drafts here involved represent moneys received by appellant upon drafts left with it solely for collection."

It is further contended by appellee that the agreement with reference to the long term bills of exchange was that they were to be kept separate from the other accounts of the Richfield Oil Company and that by this agreement to keep the accounts separately the bank waived its banker's lien upon the proceeds thereof. If the written acceptance agreement was an agreement to pledge to the bank the goods in transit to India, as we hold, and if the foreign bills of exchange which were delivered to the bank were intended as a means of acquiring possession of the proceeds derived from the sale of the goods and substituting those proceeds for the goods themselves, then it is clear that the transaction is a unit and that a separate oral agreement with relation to the 180-day bills of exchange which excepted them from the provisions of the agreement and which relieved the proceeds from the lien declared in the agreement in favor of the bank, is inconsistent with the written agreement and cannot be considered in the face of that written agreement. The net result of the claim of the appellee is that the proceeds of the two 180-day bills of exchange were not to be subject to a banker's lien, whereas the written agreement expressly provided that the proceeds of the property pledged, that is, of the goods pledged, should be applied to any other indebtedness due from the Richfield Oil Company to the bank, past, present, or future. This is clearly in conflict with an oral agreement, express or implied, that the proceeds of the two 180-day bills of exchange should not be subject to any lien on behalf of the bank for past, present, or future indebtedness. Moreover, we have examined the oral evidence concerning the arrangements between the parties, and find nothing therein justifying the conclusion that the bank intended to waive its banker's lien upon the foreign bills of exchange deposited with it by the Richfield Oil Company, as we will now point out in connection with the two other bills of exchange involved in this appeal.

A $1,245.11 bill of exchange drawn upon Ricardo Valezquez, dated December 30, 1930, was deposited with the appellee bank December 27, 1930, and paid to the bank by the drawee of the bill on May 18, 1931. A bill of exchange drawn on Birla Bros., Limited, of Calcutta, India, for $23,532.08, dated January 31, 1931, was deposited with the appellant bank January 8, 1931, and paid September 10, 1931. Papers deposited with the bank in connection with these drafts were identical in form and legal effect with those deposited in connection with the original acceptance agreement except that there was no acceptance agreement deposited therewith. In order to understand the situation in that regard it will be necessary to state some of the dealings of the parties between the date of the original acceptance agreement and the deposit on January 8, 1931, of the last of the two bills of exchange involved herein. On October 13, 1930, the oil company claimed a "draft reserve" of $9,734.16 and requested the issuance of an acceptance of one of its drafts for $5,000 deposited on October 8th and retained by the bank, being a part of the $35,000 against which no acceptances had been made. The bank replied that it had executed the acceptance for $5,000 at 90 days sight maturing January 31, 1931, and had credited the proceeds to their account, and added, "You mention that you have a draft reserve with us for $9,734.16. This figure covers the amount of your drafts Nos. 103009 and 103012 [deposited October 9 and October 12, 1930 for $4883.40] and the balance remaining on your Nos. 103006 A and 103004 [$119,850.76, minus $115,000 drafts accepted $4850.76], but evidently does not take into consideration your draft No. 103110 drawn on La Paz, Bolivia, for $11,031.14 [deposited October 10, 1930]." On October 20, 1930, after a talk with Mr. Gilstrap in which Mr. Lyons,

comptroller of the Richfield Oil Company, was told that the above-mentioned draft for $11,031.41 could be used "as reserve against acceptances," it was requested that the bank issue an acceptance for $10,000 to mature in 90 days. The bank replied that they accordingly had executed the 90-day acceptances for $10,000 and "credited your account with the proceeds, $9,925.00," and that "we have earmarked the same against the $11,031.14 bill of exchange above mentioned."

On November 24, 1930, the Richfield Oil Company requested the issuance of $25,000 in acceptances, making $155,000 in all, and inclosed a draft for $5,000 in addition to the $20,000 unaccepted drafts held by the bank as a part of the original $150,000 deposit. On November 28, 1930, the bank informed the Richfield Oil Company that it had complied with its request and had executed $25,000 in acceptances and had credited the proceeds derived from the sale thereof to the account of the oil company in the amount of $24,812.50. After the acceptance of drafts in the amount of $25,000 on November 28, 1930, the bank requested an additional acceptance agreement to cover the additional $5,000 of acceptances which it had executed on November 28th. This acceptance agreement was signed December 2d and sent to the bank December 3, 1930, to be dated by the bank and was dated November 25, 1930.

The acceptances of the bank up to January 8th amounting to $155,000 had been issued as follows:

$115,000 on October 8, due January 6, 1931
   5,000 on October 13, due January 13, 1931
  10,000 on October 20, 1930, due January 19, 1931
  25,000 on November 25, 1930, due February 26, 1931.

Against these acceptances the bank advised the Richfield Oil Company that it had collected $119,626.05 December 10th, and $10,991.07 December 31st. No other drafts were accepted by the bank in connection with the deposit of foreign bills of exchange with it by the Richfield Oil Company. In view of the fact that the bank upon the extension of additional credit of $25,000 by way of an acceptance on November 25, 1930, making the total acceptance $155,000, required an additional acceptance agreement for $5,000, we do not see upon what basis it can be claimed that other foreign bills of exchange afterward deposited without any such additional acceptance agreement came within the terms of the acceptance agreements

already executed. If other acceptances had been executed by the bank, the correspondence with relation thereto would no doubt indicate the basis upon which they were made. We think the position of the appellee is correct, that these two foreign bills of exchange (for $23,532.08, and for $1,245.11, respectively) did not come under the acceptance agreement which expressly provided for the equivalent of a banker's lien thereon. That being true the question is whether or not the banker's lien given by law upon such bills of exchange as were deposited with the bank was waived by the bank at the time the bills were deposited. The appellee contends that the agreement of the bank as testified to by Hall and Pope to keep the account of the foreign business separate was in effect a waiver of the banker's lien. This arrangement was made according to the testimony of Hall and Pope as a matter of convenience because of Hall's agreement with the Richfield Oil Company concerning commissions. Nothing was said at the time of the agreement to keep the accounts separate about the banker's lien, and as we have already pointed out, the express written agreement was that the proceeds of the bills of exchange deposited under the acceptance agreement should be available to apply to any indebtedness due from the Richfield Oil Company to the bank. This arrangement instead of being a waiver of the banker's lien was an assertion of a lien as to all collections covered by the acceptance agreement. In the general agreement or arrangement testified to by Hall to keep the foreign accounts separate from the other account of the Richfield Oil Company, there was no distinction suggested between the bills of exchange which matured in less than 90 days and those which matured in more than 90 days, although he testified that the former were and that the latter were not to be used as a basis for acceptances after the expiration of 90 days. According to Hall the agreement was that the foreign exchange business should be kept separate, not that there should be two separate accounts in the foreign exchange department, one on a short term and the other on long term bills of exchange. The two types of bills of exchange were separated in their dealings solely because of the refusal of the bank to issue acceptances upon bills of exchange which were not payable within ninety days. There was no contract, express or implied, to treat the two types of bills of exchange differently with relation to the banker's lien unless it can be said that the express assertion of the lien as to the bills of exchange included in

the acceptance agreement was an implied waiver of the lien as to those not included. But such an express agreement was necessary for under the law of California where specific property is pledged for a specific obligation to a bank, the bank has no general banker's lien upon the proceeds of the pledged property. Consequently, and in order to assert such a lien, it is necessary to stipulate in the contract by which the property was hypothecated that the proceeds of that property should be available for application to other obligations owed to the bank, if such right was agreed to by the parties. Arnold v. San Ramon Valley Bank, 184 Cal. 632, 194 P. 1012, 13 A. L. R. 320; Bell v. Bank of Cal., 153 Cal. 234, 94 P. 889; Berry v. Bank of Bakersfield, 177 Cal. 206, 170 P. 415; Continental Nat'l Bk. v. Moore, 299 F. 270 (C. C. A. 9). The mere separation of the deposit accounts in a bank as a matter of convenience would not operate as a waiver of the banker's lien, particularly where there was no agreement or understanding as to the disposition of the account. American Surety Co. v. Bank of Italy, 63 Cal. App. 149, 218 P. 466. See Minard v. Watts (C. C.) 186 F. 245; Clay County Bank v. First Natl. Bank, 178 Ark. 989, 13 S.W.(2d) 595; In re No. Missouri Trust Co. (Mo. App.) 39 S.W.(2d) 412; Union Bank & Tr. Co. v. Loble (C. C. A.) 20 F.(2d) 124.

We conclude that under the written acceptance agreements the bank had a lien equivalent to a banker's lien upon the foreign bills of exchange covering the cargo of the "Silver Ray" and "Silver Hazel" and that under the law of California the bank had a banker's lien upon the other two bills of exchange involved herein.

■ The next question arises because of the appellee's claim that the bank subsequently waived its lien, if any it had, by a transaction between the bank and the receiver which occurred immediately after his appointment, and after the bank had received the proceeds of the two Birla Bros. bills of exchange payable on sight, amounting to $119,626.05, which were sufficient to discharge the obligations to the bank upon the $115,000 drafts accepted October 8, 1930. This waiver is predicated upon certain telegraphic correspondence between the receiver and the bank. The receiver sent to the appellant the following telegram:

"Los Angeles, California. 12:30 P. Jan. 16th, 1931.

"Julian Eisenbach, San Francisco, Calif.

"As receiver I am ordered by Federal Court to take over all assets including cash in banks stop while you have undoubtedly right of offset, such right if exercised will seriously cripple receivers operations. It is necessary therefore to request that all banks restore to receiver full cash balance. Please therefore transfer such funds to a new account on your books in my name as receiver evidence of my authority and signature cards will follow by mail. Local banks have indicated they will acquiesce in this program.

"Wm. C. McDuffie, Receiver of Richfield Oil Co. of California."

To which the appellant replied as follows:

"San Francisco, Calif., Jan. 16, 1931, 6 p. m.

"W. C. McDuffie, Receiver Richfield Oil Co. of California, Richfield Bldg., 555 South Flower St., Los Angeles, Calif.

"Replying telegram we are willing to restore into your name as receiver Richfields balance in checking account provided we are notified by you that all companys banks have taken similar action. We are holding certain collections as security for acceptances. Please understand that we continue to reserve all our rights for bankers lien against these collections.

"Julian Eisenbach, Vice President Wells Fargo Bank & Union Trust Co."

This was followed by two letters which need not be quoted, and on January 22, 1931, by the following telegrams from the receiver to the bank:

"All banks have now expressed their willingness to replace Richfield Oil Company's offset balances of January 15th to credit of receiver. Will therefore greatly appreciate your at once transferring such sums to my credit advising me the amount by wire collect. Wish express appreciation your cooperation as these funds will be of great assistance."

And the reply telegram of January 23, 1931, as follows:

"Answering wire have today placed to your credit Richfield Oil Companys offset balance of January fifteenth amount forty thousand eight hundred seventy four dollars seventy-seven cents."

In considering these telegrams it will be noticed that what the receiver asked was that all banks restore to receiver full cash balances; that the appellant bank replied, "We are willing to restore into your name as receiver Richfields balance in your checking account," and that upon being notified that the other banks were willing to replace the balances of January 15th which they had off-

set, the appellant bank notified the receiver that they had placed to the receiver's credit the offset balance of January 15th amounting to $40,874.77. From this portion of the correspondence it would seem to be perfectly plain and clear that the balance asked and agreed to be restored was a balance of $40,-874.77 in the checking account of the Richfield Oil Company, but the appellee contends that there are other portions of these telegrams which indicate a promise on the part of the bank to waive its lien, if any it had, upon the four bills of exchange in controversy. Reference is made to the telegram of January 16th where the receiver states that he is to take over all assets including cash in the banks. The argument is that in view of this statement it must be assumed that the words "full cash balance" used later in the telegram refers to assets such as the foreign bills of exchange in its possession. This argument is predicated particularly upon the necessities of the receivership and the results sought to be accomplished by restoring cash balances so that the receiver could continue to conduct the business of the corporation. We cannot see how this statement by the receiver can be considered more than a statement showing that he had authority dealing with the bank. This statement was to be followed by a copy of the order appointing the receiver which would show that the bank had a right to transfer the assets to him as a representative of the Richfield Oil Company and of the court. If we consider the telegram by its four corners, it obviously refers to the restoration of the checking account in the bank so that the receiver would stand in the shoes of the Richfield Oil Company. The reply is, "We are willing to restore balance in checking account." This was an acceptance of the proposition subject to confirmation by the other banks. Appellee bases an extensive argument on the final sentence in the reply telegram of January 16th with reference to "certain collections." It would seem clear that this sentence was inserted in the telegram as a matter of precaution and to prevent uncertainty. If we assume that the bank had a banker's lien against any collections, it is clear that it intended to reserve its lien thereon and that the words "certain collections" relate to those foreign bills of exchange which are hypothecated "as security for acceptances." The argument of the appellee then is, first, that this sentence reserving a lien does not refer to the bills of exchange which had been deposited for collection against which no acceptances has been issued; and, second, inas-

much as the reference is merely to such bills of exchange as are held as security for acceptances, the reservation of the right to a banker's lien against such bills of exchange in effect waives the banker's lien upon all other bills of exchange held by the bank, but not held as security for acceptances because, it is claimed, an express reservation of lien upon certain property is a waiver of the lien against other property not mentioned.

In view of these claims we will consider first the relation of the parties to the two 180-day bills of exchange of the Birla Company after the payment of the bills of exchange which were applied to and which extinguished the obligation of the Richfield Oil Company upon the acceptances for the $115,-000. The acceptance agreement provides that in case of the sale or disposition of the property aforesaid the bank might apply the proceeds "to the payment of all legal or other costs, etc., and may apply the residue of such proceeds to the payment of this or any existing liability of ourselves to you whether then payable or not, returning the overplus to us. * * *" If, as we hold, the 180-day bills of exchange were a part of the security given to the bank for the acceptances as a means of collecting the proceeds of the sale of the property by the Richfield Oil Company to the Birla Bros., it is clear that these bills of exchange, even after the payment of the $115,000 upon the bills payable at sight were still held as security for acceptances theretofore or thereafter to be executed. It is clear also that under the express terms of the acceptance agreement these bills of exchange were held as security for any other liability of the Richfield Oil Company to the bank, whether due or not. Consequently, when the bank, in its telegram of January 16th, reserved "all our rights for banker's lien against these collections," it expressly reserved its right to the proceeds derived from these particular bills of exchange. We have followed the argument of the appellee in regard to this last sentence in the bank's telegram of July 16th to show that there is nothing inconsistent in the two parts of the telegram. The situation with reference to the bills of exchange for $23,-532.08, drawn on Birla Bros., and the one for $1,245.11 drawn on Valezquez, is somewhat different. They were not held in a special sense "as security for acceptances." No credit had been extended on account of them, but the bank had a lien thereon for all sums due it which would include, of course, sums due it upon unpaid acceptances. The amount unpaid on January 16, 1931, on ac-

ceptances was about $25,000. So, if we construe the bank's telegram of January 16th with technical nicety, the bank expressly reserved its "banker's lien on these collections." The broader view is that they were not included in the checking account which the bank agreed to restore, and, consequently, it was unnecessary for the bank to express any reservation of its lien thereon. The matter was not under consideration. Furthermore, the agreement to keep the general account of the. Richfield Oil Company separate from its foreign business account precludes the idea that the telegrams exchanged on January 16th, or immediately thereafter, had any reference to the foreign account. We should add that the appellee further fortifies its contention concerning the meaning of this sentence in the telegram of January 16th by evidence as to the conduct of the bank and of the receiver thereafter with relation to funds derived from bills of exchange similarly placed. This evidence consists of the fact that the bank credited the checking account of the receiver with the proceeds of several bills of exchange which were afterward collected by it in connection with the foreign business amounting in all to $39,469.57, and that it filed a proof of claim with the receiver for the amount of the $625,000 note above mentioned in which claim it is stated that the bank held no lien or security therefor. Subsequently, the bank amended this claim to assert its contention that the amounts collected or to be collected upon the bills of exchange in question were security for and to be offset against the obligation of $625,000. It is sufficient to say that where the agreement evidenced by the telegrams is clear and definite, the subsequent conduct of the parties inconsistent therewith does not alter the contract nor furnish the means for its interpretation. The fact is· that the bank waived its lien upon $39,469.57. It is explained by the officer of the bank that at the time these amounts were credited to the checking account of the receiver it was believed by the bank that the Richfield Oil Company was solvent and would be able to pay the claims against it; but that by the time the Birla Bros.' bills of exchange were collected the officers of the bank had become satisfied that the company would not be able to do so. Whether this is a true explanation of the conduct of the bank is entirely immaterial.

The appellee also introduced evidence to show the subsequent conduct of the· other banks with relation to their waiver agreements. Their conduct was not brought home to the appellant and is of no significance whatever, and even if brought to· the attention of the bank after the transaction was closed, would be without significance. There was no estoppel. The language used by the parties in the exchange of telegrams is plain and unambiguous, and cannot be enlarged by the subsequent conduct of the parties unless conduct itself constituted a waiver.

We have not undertaken in this opinion to set forth all the evidence pro and con bearing upon the points in issue. The parties submitted to the court all the banking transactions between them in the foreign department and the evidence of the negotiations leading up to the agreement of October 8th, and all the documents and transactions subsequent thereto. The transcript contains 489 pages, and the briefs about 275 pages. Each party has advanced some testimony and some arguments that we have not discussed in this opinion. To follow the ramifications of this argument would extend this opinion beyond reasonable limits. We have pointed out what we consider to be the controlling evidence under the law. There is practically no dispute in the evidence except with relation to the conversation between Hall and Pope on behalf of the Richfield Oil Company and of the officers of· the bank who participated in the same conversations. We have also refrained from discussing the probabilities with reference to the conduct and intent of the parties, not only because there are plausible arguments on each side· of that question, but more particularly because of the fact that the agreement between the parties was definite and certain and in the main in writing, and, hence, the interpretation thereof is not substantially aided ·by such considerations.

Decree reversed.